COPY

E-filing

1  EDMUND G. BROWN JR.
   Attorney General of California
2  J. MATTHEW RODRIQUEZ
   Chief Assistant Attorney General
3  KEN ALEX
   Senior Assistant Attorney General
4  TARA L. MUELLER
   Deputy Attorney General
5  State Bar No. 161536
   MEGAN ACEVEDO
6  Deputy Attorney General
   State Bar. No. 226604
7  Office of the Attorney General
   1515 Clay Street, Suite 2000
8  P.O. Box 70550
   Oakland, California  94612-0550
9  Telephone:  (510) 622-2136
   Facsimile:  (510) 622-2270
10 E-mail:  Tara.Mueller@doj.ca.gov
   *Attorneys for Plaintiff People of the State of*
11 *California, ex rel. Edmund G. Brown Jr., Attorney*
   *General*
12
                    IN THE UNITED STATES DISTRICT COURT
13
                 FOR THE NOTHERN DISTRICT OF CALIFORNIA
14

ADR

15

16                              C08-05775

17 **PEOPLE OF THE STATE OF**              Case No.:
   **CALIFORNIA, EX REL. EDMUND G.**
18 **BROWN JR., ATTORNEY GENERAL,**       **COMPLAINT FOR DECLARATORY**
                                          **AND INJUNCTIVE RELIEF**
19                         **PLAINTIFF,**

20                    v.

21 **DIRK KEMPTHORNE, SECRETARY,**
   **UNITED STATES DEPARTMENT OF**
22 **THE INTERIOR; CARLOS GUTIERREZ,**
   **SECRETARY, UNITED STATES**
23 **DEPARTMENT OF COMMERCE;**
   **UNITED STATES FISH AND WILDLIFE**
24 **SERVICE; AND NATIONAL MARINE**
   **FISHERIES SERVICE,**
25

26                      **DEFENDANTS.**

27

28
                                    1

**INTRODUCTION**

1.     This action, brought on behalf of the People of the State of California, seeks to set aside regulations promulgated by the Secretary of the Interior, acting by and through the United States Fish and Wildlife Service ("FWS"), and the Secretary of Commerce, acting by and through the National Marine Fisheries Service ("NMFS") (collectively, the "Services" or "defendants"), pursuant to the federal Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.  The regulations amend longstanding existing regulations implementing the section 7 consultation provisions of the ESA, 16 U.S.C. § 1536.  Section 7 ensures federal agency compliance with the ESA, and the section 7 consultation process is essential to the objective, scientific evaluation and effective mitigation of the effects of a wide variety of federal activities on endangered and threatened species and their habitat.

2.     The new regulations substantially alter the substantive and procedural requirements for conducting inter-agency consultation under section 7 of the ESA.  In doing so, the regulations violate the letter and sprit of the ESA and numerous binding judicial precedents interpreting the ESA.  The regulations eliminate or short-circuit the section 7 consultation process for many federal agency actions, restrict the types of effects that must be evaluated and mitigated, and replace the current statutorily-mandated scientific consultation process with the self-interested and unscientific decisions of federal agency project proponents and their permittees and licensees.  In sum, the regulations will significantly reduce the number, extent and effectiveness of section 7 consultations under the ESA.  This in turn will lead to further imperilment and even possible extinction of endangered and threatened species and further destruction and adverse modification of these species' designated critical habitat, contrary to the ESA.

3.     This action also challenges the adequacy of the Services' environmental assessment ("EA") prepared for the regulations pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and their preparation of a finding of no significant impact ("FONSI") and failure to prepare an environmental impact statement ("EIS") under NEPA.  Finally, this action alleges that the Services' process for promulgating the regulations and adopting the EA and FONSI violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 552,

2

1  by failing to: articulate a rational basis for the regulations, provide meaningful public notice and

2  comment on the regulations and the draft EA, and adequately to respond to public comments on

3  these documents.

4      4.      California will be disproportionately affected by the significant and adverse

5  environmental effects of the regulations. As of October 2008, California is home to 310 plant and

6  animal species listed as endangered or threatened under the ESA, more than any other mainland

7  state. In addition, California has millions of acres of federal public lands, multiple federal water

8  projects, numerous military bases and facilities and other federal facilities and infrastructure

9  projects that are subject to section 7 consultation requirements. In addition, countless acres of

10 non-federal lands and numerous non-federal facilities in California are subject to federal

11 permitting and licensing requirements – and therefore section 7 consultation requirements -- such

12 as permitting of dredging and filling activities under section 404 of the federal Clean Water Act

13 and licensing of hydropower facilities under the Federal Power Act.

14     5.      The State of California seeks a declaration that the regulations were illegally

15 promulgated in violation of the ESA and APA and that the Services' EA and failure to prepare an

16 EIS violate NEPA and the APA. The State of California also seeks an injunction requiring the

17 Services vacate and withdraw the regulations.

18                              **JURISDICTION**

19     6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

20 laws of the United States) and 5 U.S.C. § 701 et seq. ("APA").

21     7.      An actual controversy exists between the parties within the meaning of 28 U.S.C. §

22 2201(a). The Court may grant declaratory relief, injunctive relief, and any additional relief

23 available, pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

24     8.      The Services' promulgation of a final rule, final EA and FONSI on December 16,

25 2008 are final agency actions within the meaning of the APA, 5 U.S.C. §§ 702, 704, and are

26 therefore judicially reviewable within the meaning of that statute. *Id.*, § 706.

27 //

28

Complaint for Declaratory and Injunctive Relief  (Case No.                    )

1    9.    Plaintiff People of the State of California have suffered legal wrong due to the

2    Services' actions, and are adversely affected or aggrieved by the Services' actions within the

3    meaning of the United States constitution and the APA.  5 U.S.C. § 702.  Plaintiff People have an

4    interest in protecting the natural resources of the State, including the state's fish and wildlife

5    resources, endangered and threatened species, and water resources, which are State property held

6    in trust by the State for the benefit of the People.  *People v. Truckee Lumber Co.*, 116 Cal. 397

7    (1897); *Betchart v. Calif. Dep't of Fish and Game*, 158 Cal. App. 3d 1104 (1984); *National*

8    *Audubon Society v. Superior Court*, 33 Cal. 3d 419 (1983); Cal. Water Code § 102.

9    10.    The final rule adversely affects the People's concrete, proprietary interests in

10   protection of the natural resources of the state, including the State's proprietary interests in its fish

11   and wildlife and water resources.  The final rule will significantly increase the likelihood that

12   federal agency actions, including permits and licenses issued by federal agencies to non-federal

13   parties, that are undertaken in the State of California will significantly and adversely affect the

14   fish and wildlife resources of the State, including endangered and threatened species, and their

15   habitat.  In addition, the Services' failure to prepare an adequate EA and EIS and failure to

16   provide sufficient public notice and comment and responses to public comment on the regulations

17   and EA has harmed the People's procedural interests in participating in a legally sound

18   rulemaking and environmental review process that adequately considers and accounts for public

19   input.

20   11.    Plaintiff People has exhausted its administrative remedies by timely submitting

21   detailed comments on the proposed regulations on October 14, 2008, and detailed comments on

22   the draft EA on November 6, 2008.

23   12.    Plaintiff People is a "person" within the meaning of 5 U.S.C. § 551(2), and is

24   authorized to bring suit under the APA to challenge unlawful agency action.  5 U.S.C. § 702.

25                    **VENUE AND INTRADISTRICT ASSIGNMENT**

26   13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because

27   plaintiff People of the State of California, acting by and through Attorney General Edmund G.

28

1   Brown Jr., maintain offices within this judicial district in Oakland and San Francisco.  Moreover,

2   three other cases challenging the Services' regulations and environmental review for the

3   regulations already have been filed in this judicial district.  See N.D. Cal. Case Nos. CV 08-5546

4   MHP, CV 08-5605 MMC and CV 08-5654 SI.  Finally, venue is proper in this judicial district

5   because this is a civil action brought against agencies of the United States and officers and

6   employees of the United States acting in their official capacities under color of legal authority, no

7   specific real property is involved in this action and threatened and endangered species that will be

8   adversely affected by the final rule reside in this judicial district.

9        14.   Pursuant to Northern District of California Civil Local Rule 3-2(d), assignment to the

10   San Francisco Division of this Court is appropriate for the reasons explained in the preceding

11   paragraph.

12   **PARTIES**

13        15.   Plaintiff People of the State of California bring this action by and through Attorney

14   General Edmund G. Brown Jr., the chief law enforcement officer of the State.  Cal. Const., art. V,

15   § 13.  This challenge is brought pursuant to the Attorney General's independent constitutional,

16   common law, and statutory authority to file civil actions to represent the people's interests in

17   protecting the environment and natural resources of the State from pollution, impairment or

18   destruction. *Id.*; Cal. Gov't Code §§ 12511, 12600-12612; *D'Amico v. Bd. Of Medical*

19   *Examiners*, 11 Cal. 3d 1 (1974).

20        16.   Defendant DIRK KEMPTHORNE, United States Secretary of the Interior, is the

21   highest ranking official within the U.S. Department of the Interior.  The U.S. Department of the

22   Interior is the federal agency ultimately responsible for administering the ESA with regard to

23   endangered and threatened terrestrial and freshwater plant and animal species and certain marine

24   species, for maintaining the lists of all endangered and threatened species, and for compliance

25   with all other federal laws which the Department of the Interior has authority to implement.

26   Defendant KEMPTHORNE is sued in his official capacity.

27

28

1      17.    Defendant FWS is the agency within the Department of Interior to which the

2   Secretary of the Interior has delegated principal responsibility for day-to-day administration of

3   the ESA with respect to terrestrial and freshwater plant and animal species and certain marine

4   species.

5      18.    Defendant CARLOS GUTIERREZ, United States Secretary of Commerce, is the

6   highest ranking official within the U.S. Department of Commerce.  The U.S. Department of

7   Commerce is the federal agency ultimately responsible for administering the ESA with regard to

8   most endangered and threatened marine and anadromous fish species and for compliance with all

9   other laws which the Department of Commerce has authority to implement.  Defendant

10  GUTIERREZ is sued in his official capacity.

11     19.    Defendant NMFS is the agency within the Department of Commerce to which the

12  Secretary of Commerce has delegated principal responsibility for day-to-day administration of the

13  ESA with respect to most marine and anadromous fish species.

14     20.    The Secretaries of the Departments of Interior and Commerce, acting by and through

15  the FWS and NMFS, respectively, promulgated the final regulations, prepared the EA, and issued

16  the FONSI, each of which are challenged in this action.

### STATUTORY AND REGULATORY FRAMEWORK

**A.    The Endangered Species Act**

19     21.    The fundamental purposes of the ESA are to "provide a means whereby the

20  ecosystems upon which endangered and threatened species depend may be conserved" and to

21  provide "a program for the conservation of such endangered species."  16 U.S.C. § 1531(b).  The

22  ESA further declares it to be "the policy of Congress that all Federal departments and agencies

23  shall seek to conserve endangered species and threatened species and shall utilize their authorities

24  in furtherance of the purposes of this chapter."  16 U.S.C. § 1531(c).  The ESA defines

25  "conserve" and "conservation" broadly as "to use and the use of all methods and procedures

26  which are necessary to bring any endangered species or threatened species to the point at which

27  the measures provided by this chapter are no longer necessary" – i.e. to the point of full recovery.

28  16 U.S.C. § 1532(3).

1    22.    In the landmark case of *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978),

2    the United States Supreme Court described the ESA as "the most comprehensive legislation for

3    the preservation of endangered species ever enacted by any nation. . . . The plain intent of

4    Congress in enacting this statute was to halt and reverse the trend toward species extinction,

5    whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every

6    section of the statute." *Id.* at 180, 184.

7    23.    The Services are charged with listing species as endangered or threatened. A species

8    is "endangered" if it "is in danger of extinction throughout all or a significant portion of its

9    range." 16 U.S.C. § 1532(6). A species is "threatened" if it is "likely to become an endangered

10   species within the foreseeable future." 16 U.S.C. § 1532(20).

11   24.    When the Services list a species as endangered or threatened, generally they also must

12   designate critical habitat for that species. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C). The ESA

13   defines critical habitat as: "(i) the specific areas within the geographical area occupied by a

14   species, at the time it is listed in accordance with the [ESA], on which are found those physical or

15   biological features (I) essential to the conservation of the species and (II) that may require special

16   management considerations or protection; and (ii) specific areas outside the geographical area

17   occupied by a species at the time it was listed . . . upon a determination by the Secretary that such

18   areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

19   25.    Section 7 of the ESA is one of the primary means Congress established to implement

20   the overriding conservation purpose of the statute. *TVA v. Hill*, 437 U.S. at 181-185. Section 7

21   contains substantive as well as procedural requirements – both of which are mandatory. *National*

22   *Assn. of Homebuilders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2535 (2007); *Thomas v.*

23   *Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). Substantively, section 7(a)(2) provides in pertinent

24   part that "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary

25   [of the Interior or of Commerce], insure that any action authorized, funded or carried out by such

26   agency . . . is not likely to jeopardize the continued existence of any endangered species or

27   threatened species or result in the destruction or adverse modification of" any designated critical

28   habitat for such species. 16 U.S.C. § 1536(a)(2). "To insure" means "to make certain, to secure,

7

1    to guarantee (some thing, event, etc.)." *National Assn. of Homebuilders*, 127 S. Ct. at 2534. The

2    statute further provides that "in fulfilling the requirements of this paragraph [§ 7(a)(2)] each

3    agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

4         26.    In *TVA v. Hill*, the Supreme Court held that "the legislative history undergirding § 7

5    reveals an explicit congressional decision to require agencies to afford first priority to the

6    declared national policy of saving endangered species," and to "give endangered species priority

7    over the 'primary missions' of federal agencies." *TVA v. Hill*, 437 U.S. at 185; see also *id.* at

8    174, 194. Thus, the substantive mandate of section 7 "applies to every discretionary agency

9    action regardless of the expense or burden its application might impose." *National Assn. of

10   Homebuilders*, 127 S. Ct. at 2537.

11        27.    Section 7 contains explicit procedures designed to ensure that each federal agency

12   actually implements the statute's affirmative command. Section 7(c) provides that: "[t]o facilitate

13   compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to

14   any agency action . . . request of the Secretary information whether any species which is listed or

15   proposed to be listed may be present in the area of such proposed action. If the Secretary advises,

16   based on the best scientific and commercial data available, that such species may be present, such

17   agency shall conduct a biological assessment . . . identifying any endangered species or

18   threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c)(1).

19        28.    If any such species is likely to be affected by the federal agency action, the agency

20   must formally consult with the Secretary, who must then prepare a biological opinion "detailing

21   how the agency action affects the species or its critical habitat" and determining whether the

22   action is likely to jeopardize the continued existence of any listed species or adversely modify or

23   destroy any designated critical habitat. 16 U.S.C. § 1536(b)(3)(A). The biological opinion must

24   include "a summary of the information on which the opinion is based." *Id.* If jeopardy or

25   adverse modification is found, the biological opinion must include "reasonable and prudent

26   alternatives" to the agency action that "can be taken by the federal agency or applicant in

27   implementing" the action and that the Secretary believes would avoid jeopardy or adverse

28   modification. *Id.* Finally, the biological opinion must include a written statement (referred to as

8

1    an "incidental take statement") specifying the impacts of any incidental taking[1] on the species,

2    any "reasonable and prudent measures that the [Services] consider[] necessary or appropriate to

3    minimize such impact," and the "terms and conditions" that the agency must comply with in

4    implementing those measures.  16 U.S.C. § 1536(b)(4).

5        29.    The Services adopted joint regulations implementing section 7 in 1986.  51 Fed. Reg.

6    19926 (June 3, 1986).  These regulations have not been substantially amended since that time.  In

7    order to implement the basic statutory mandate in section 7(a)(2) of the ESA to avoid jeopardy to

8    listed species and destruction and adverse modification of critical habitat, the regulations require

9    federal action agencies to review their actions "at the earliest possible time to determine whether

10   any action may affect listed species or critical habitat."[2]  50 C.F.R. § 402.14(a), emphasis added.

11   This includes requesting information from the relevant Service as to whether any listed species or

12   critical habitat "may be present" in the action area, and in some circumstances, preparing a

13   biological assessment of the action.  50 C.F.R. § 402.12.

14       30.    If an action "may affect" any listed species or critical habitat, the federal action

15   agency must either initiate formal consultation with the relevant Service, or alternatively, engage

16   in informal consultation.  50 C.F.R. §§ 402.13(a), 402.14(a), (b)(1).  The existing rules make

17   clear that "may effect" is an extremely low threshold: "[a]ny possible effect, whether beneficial,

18   benign, adverse or of an undetermined character, triggers the formal consultation requirement."

19   51 Fed. Reg. 19949.

20       31.    During the informal consultation process, the federal agency may determine that the

21   action is not "not likely to adversely affect" listed species or critical habitat, but must first obtain

22   the Service's *written* concurrence in this determination in order to proceed with the project.  50

23   C.F.R. §§ 402.13(a), 402.14(b)(1).  If the federal agency has prepared a biological assessment that

24       [1] The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap,
25   capture or collect or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19); see also
     50 C.F.R. §§ 17.3, 222.102 (defining "harass" and "harm" for purposes of "harass").
26       [2] The regulations define "action" broadly as "all activities or programs of any kind
     authorized, funded or carried out, in whole or in part, by Federal agencies," including
27   promulgation of regulations, granting of permits, licenses, contracts and other entitlements, and
     any other action that directly or indirectly causes changes to land, air and/or water.  50 C.F.R. §
28   402.02.

Complaint for Declaratory and Injunctive Relief  (Case No.                    )

1   reaches a "not likely to adversely affect" conclusion, the agency likewise must obtain the

2   Service's written concurrence in order to proceed. 50 C.F.R. § 402.12(j), (k)(1). If the Service

3   agrees that an action is "not likely to adversely affect" listed species or critical habitat, then no

4   further consultation is required. 50 C.F.R. §§ 402.12(j), (k)(1), 402.13(a), 402.14(b)(1). In

5   determining whether to "concur" that the action is not likely to adversely affect listed species or

6   critical habitat, the Services may "suggest modifications to the action that the Federal agency and

7   any applicant could implement to avoid the likelihood of adverse effects to listed species or

8   critical habitat." 50 C.F.R. § 402.13(b).

9        32.   If the Service does not concur in a federal agency's "not likely to adversely affect"

10   determination (or the federal agency itself requests formal consultation), the Service must prepare

11   a formal biological opinion including a detailed analysis, based on the best scientific and

12   commercial data available, of the direct, indirect and cumulative effects of the action on listed

13   species and critical habitat. 50 C.F.R. § 402.14(d), (f), (g), (h). The biological opinion also must

14   include "reasonable and prudent measures" to avoid, minimize or mitigate any identified effects

15   and, if necessary, "reasonable and prudent alternatives" to avoid jeopardy to listed species or

16   adverse modification or destruction of critical habitat. 50 C.F.R. § 402.14(g)(8), (h)(3), (i)(1).

17   **B.    The National Environmental Policy Act**

18        33.   NEPA is this nation's "basic environmental charter." 40 C.F.R. § 1500.1(a). NEPA

19   has a two-fold purpose. First, NEPA is designed to ensure that federal agencies "will have

20   available, and will carefully consider, detailed information concerning significant environmental

21   impacts" of their actions before they occur. *Robertson v. Methow Valley Citizens Council*, 490

22   U.S. 332, 349 (1989); see also 40 C.F.R. § 1500.1(c). Second, NEPA "also guarantees that the

23   relevant information will be made available to the larger [public] audience that may also play a

24   role in both the decision-making process and the implementation of that decision." *Id.*; see also

25   40 C.F.R. § 1500.1(b).

26        34.   NEPA and its implementing regulations require that all federal agencies must prepare

27   an EIS for all "major federal actions significantly affecting the quality of the human

28

Complaint for Declaratory and Injunctive Relief  (Case No.                    )

1   environment." 42 U.S.C. § 4332(2)(C)(i).  A "major federal action includes "new or revised

2   agency rules [and] regulations." 40 C.F.R. § 1508.18(a).  An EIS must include, inter alia, a

3   detailed statement of: (1) the environmental effects, including direct, indirect and cumulative

4   effects, of the proposed action; (2) any adverse environmental effects that cannot be avoided if

5   the proposed action is implemented; (3) reasonable alternatives to the proposed action; and (4)

6   mitigation measures to minimize any significant effects identified.  42 U.S.C. § 4332(2)(C); 40

7   C.F.R. §§ 1508.7, 1508.8, 1502.10, 1502.14, 1502.16.

8       35.   The "threshold question in a NEPA case is whether a proposed project will

9   'significantly affect' the environment, thereby triggering the requirement for an EIS." *Blue*

10  *Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  An agency

11  may elect to prepare an EA "[a]s a preliminary step . . . to decide whether the environmental

12  impact of a proposed action is significant enough to warrant preparation of an EIS." *Id.*, citing 40

13  C.F.R. § 1508.9(a).  An EA must "include brief discussions of the need for the proposal, of

14  alternatives [to the proposal], of the environmental impacts of the proposed action and

15  alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).   In so

16  doing, an EA must "provide sufficient evidence and analysis for determining whether to prepare

17  an environmental impact statement or a finding of no significant impact." 40 C.F.R. §

18  1508.9(a)(1).  This includes a discussion of cumulative impacts.  *Native Ecosystems Council v.*

19  *Dombeck*, 304 F.3d 886, 895-896 (9th Cir. 2002).  "Because the very important decision whether

20  to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making

21  process." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

22      36.   If the EA indicates that the federal action may significantly affect the quality of the

23  human environment, or if "substantial questions are raised" as to whether a proposed federal

24  agency action may have a significant effect on some human environmental factor, then the agency

25  must prepare an EIS.  40 C.F.R. § 1501.4(c); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d

26  549, 562 (9th Cir. 2006).  "This is a low standard."  *Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at

27  462.  Thus, in challenging a federal agency's decision not to prepare an EIS, a "plaintiff need not

28

11

1   show that significant effects will in fact occur," rather; a plaintiff need only raise "substantial

2   questions whether a project may have a significant effect." *Id.*

3      37.   In evaluating the "significance" of an environmental impact for purposes of

4   determining whether an EIS is required federal agencies must consider, inter alia: (1) "[t]he

5   degree to which the effects . . . are likely to be highly controversial"; (2) "[t]he degree to which

6   the possible effects . . . are highly uncertain or involve unique or unknown risks"; (3) "[t]he

7   degree to which the action may establish a precedent for actions with significant effects or

8   represents a decision in principle about a future consideration"; (4) whether the action may result

9   in significant cumulative effects; and (5) "[t]he degree to which the action may adversely affect

10   an endangered or threatened species or its critical habitat." 40 C.F.R. § 1508.27(b).

11      38.   If, after preparing an EA, the agency determines an EIS is not required, the agency

12   must provide a "convincing statement of reasons" why the project's impacts are insignificant and

13   issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9, 1508.13.  An

14   agency's decision not to prepare an EIS will be found invalid if the agency has failed to "take a

15   hard look at the environmental consequences" of its action, the agency's analysis is not "based on

16   a consideration of the relevant factors" and/or "the agency fails to supply a convincing statement

17   of reasons why potential effects are insignificant." *Metcalf*, 214 F.3d at 1141; *Blue Mts.*

18   *Biodiversity Project*, 161 F.3d at 1211.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Proposed Rule and Draft EA

21      39.   On August 15, 2008, the Services published in the Federal Register the "Proposed

22   Regulations Amending the Endangered Species Act's Section 7 Regulations" ("Proposed Rule").

23   73 Fed. Reg. 47868, Aug. 15, 2008.  Even though the Proposed Rule constitutes the most

24   significant changes to the ESA's section 7 implementing regulations in more than 20 years, the

25   public was initially provided with just 30 days in which to comment.  On September 15, 2008 –

26   the day public comments otherwise would have been due -- in response to numerous objections

27   by members of the public, the Services agreed to extend the comment period on the Proposed

28   Rule for 30 additional days.

40.   The Proposed Rule sets forth numerous significant changes to the ESA's section 7 implementing regulations, 50 C.F.R. Part 402 ("Interagency Cooperation Under the Endangered Species Act"), nearly all of which ultimately were adopted in the final rule.  First, the rule exempts from section 7 altogether federal agency actions that the federal agency project proponent itself determines "are not anticipated to result in take," and that meet one or more of several other specified criteria.

41.   Specifically, consultation is not required if the federal action agency unilaterally determines that: (1) the action will have "no effect on a listed species or critical habitat"; (2) the action is "an insignificant contributor to any effects on a listed species or critical habitat"; or (3) the effects of the action on listed species or critical habitat "are not capable of being meaningfully identified or detected," are "wholly beneficial" or are "such that the potential risk of jeopardy to the listed species or adverse modification or destruction of critical habitat is remote."  Proposed 50 C.F.R. § 402.03(b).

42.   The Proposed Rule allows the federal action agency to make the above determinations without the Services' review and written concurrence and without conducting any site-specific analysis or preparing any documentation -- even if listed species and critical habitat may be present in the action area and may be affected by the agency action.  The Proposed Rule requires consultation only as to those effects that do not meet the foregoing consultation exemption criteria of proposed section 403.03(b).  Proposed 50 C.F.R. § 402.03(c).

43.   Second, the Proposed Rule provides that the federal action agency may terminate consultation as to "a number of similar actions, an agency program, or a segment of a comprehensive plan" if the agency determines, with the Service's concurrence, that the activity is not likely to adversely affect any listed species or critical habitat.  Proposed 50 C.F.R. § 402.13(a).

44.   Third, of those federal agency actions, components of agency actions and/or effects that remain subject to the section 7 consultation requirements because they may in fact affect listed species or critical habitat, the Proposed Rule allows federal action agencies to terminate the informal consultation process and proceed with the action if the Service has not provided a

13

1   written concurrence with a federal agency's determination that its action is "not likely to

2   adversely affect" listed species or critical habitat within sixty days of the date on which the

3   federal agency requests such concurrence.[3]   Proposed 50 C.F.R. §§ 402.13(b), 402.14(b)(1).

4   Under this aspect of the Proposed Rule, the consultation requirements of section 7(a)(2) are

5   deemed satisfied – even if there has been no actual "consultation" whatsoever and even if the

6   action may adversely affect listed species or critical habitat – simply because the specified time

7   period has passed with no input by the Service.

8          45.   Finally, the Proposed Rule significantly narrows the type and extent of indirect and

9   cumulative effects that must be considered when federal action agencies or the Services are: (1)

10   determining whether a federal agency action or effect is exempt from section 7 under new section

11   402.03(b); (2) preparing biological assessments; (3) determining whether an action is not likely to

12   adversely affect listed species or critical habitat during informal consultation; (4) preparing

13   biological opinions during formal consultation; (5) determining whether to reinitiate consultation;

14   and (6) undertaking other consultation activities.   50 C.F.R. §§ 402.12, 402.13, 402.14, 402.16.

15   The Proposed Rule only requires consultation as to those project effects that meet the new,

16   restrictive definitions of "effects" and "cumulative effects," which will exclude from

17   consideration by the Services and federal action agencies many adverse impacts on listed species

18   and critical habitat.

19          46.   Specifically, under the Proposed Rule, federal action agencies and the Services only

20   need to consider indirect effects for which the action is the "essential cause" and that are

21   "reasonably certain to occur" based on "clear and substantial information."   Proposed 50 C.F.R. §

22   402.02.   The Federal Register notice states that "our intent is to clarify that there must be a close

23   causal connection between the action under consultation and the effect that is being evaluated. . . .

24   [I]f an effect would occur regardless of the action, then it is not appropriate to require the action

25   agency to consider it an effect of the action." 73 Fed. Reg. 47870.   The requirement that effects

26   be "reasonably certain to occur" based on "clear and substantial information" is intended "to

27   _____
    [3] The Service may extend this period for no more than 60 additional days upon notice to
    the federal action agency within the initial 60-day period.   Proposed 50 C.F.R. § 402.13(b).
28

14

1   make clear that the effect cannot be just speculative and that it must be more than just likely to

2   occur." Id.  Indeed, the Proposed Rule purports to require, in some instances, even "more than a

3   technical 'but for' connection," and to necessitate a showing that the action is "intended to bring

4   about the future effects," a standard that is, practically speaking, impossible to meet. Id.

5        47.   In addition, the Proposed Rule provides that cumulative effects "do not include future

6   Federal activities that are physically located within the action area of the particular Federal action

7   under consideration." Proposed 50 C.F.R. § 402.02.

8        48.   Secretary Kempthorne's press release concerning the Proposed Rule states that "[b]y

9   making these changes, we prevent an expansion of the ESA into an inefficient, indirect avenue for

10  greenhouse gas regulation, a purpose for which the ESA was never intended – and for which it is

11  ill suited." The Services' Federal Register notice announcing the Proposed Rule similarly states

12  that "[t]hese regulations reinforce the Services' current view that there is no requirement to

13  consult on greenhouse gas (GHG) emissions' contribution to global warming and its associated

14  impacts on listed species." 73 Fed. Reg. 47872. The Federal Register notice also indicates that

15  two further purposes of the Proposed Rule are to eliminate "unnecessary consultations" that are

16  not an "efficient use of limited resources" and to "simplify the consultation process and make it

17  less burdensome and time consuming." Id. at 47870-71.

18       49.   On October 14, 2008, the California Attorney General, on behalf of plaintiff People,

19  timely submitted a detailed 17-page comment letter on the Proposed Rule, urging the Services to

20  withdraw the proposal.  The Attorney General's comment letter states that "the proposed

21  regulations would violate the ESA and long-standing judicial precedents, lead to further

22  imperilment of endangered and threatened species and their habitat, and replace the current

23  scientific consultation process with the self-interested decisions of agency bureaucrats and

24  political appointees."

25       50.   The letter notes that the Proposed Rule "would effect sweeping changes to the

26  safeguards essential to the protection of California's and the nation's most vulnerable species.

27  The proposed changes would eliminate or short-circuit the section 7 consultation process for

28  many federal agency actions, restrict the types of project effects that must be evaluated and

15

1   mitigated, and replace the Services' scientific review and analysis with the inexpert judgments of

2   project proponents. If finalized, the regulations will substantially reduce the number and extent

3   of section 7 consultations under the ESA." The Attorney General further commented that the

4   Proposed Rule "use[s] the purported need to prevent 'expansion' of the ESA into an avenue for

5   greenhouse gas regulation as a stalking horse for a wholesale, unauthorized overhaul of the statute

6   itself."

7       51.   In October 2008, the Services prepared a "Draft Environmental Assessment for the

8   Proposed Modifications to Regulations Implementing Interagency Cooperation Under the

9   Endangered Species Act" ("Draft EA") regarding the Proposed Rule. The Draft EA purports to

10   "examine whether the proposed regulatory changes will have any direct, indirect, or cumulative

11   impacts on the quality of the human environment." Draft EA at 13. However, the document

12   lacks any credible analysis of the impacts associated with the Proposed Rule. Instead, the EA

13   concludes, without supporting evidence or analysis, that the Proposed Rule will have no

14   environmental effects whatsoever. *See e.g., id.* at 16-17. Without exception, each of the sections

15   of the EA concludes that the proposed changes "will not result in any significant environmental

16   consequences," individually or collectively. *Id.* at 16, 18, 20, 23, 25. Similarly, the EA makes

17   the wholly unsupported statement that "while some may believe that one or more of the proposed

18   regulatory changes will somehow result in substantive changes in the level of species protection,

19   the Services do not believe this is the case." *Id.* at 13.

20       52.   Besides the required "no action" alternative, the Draft EA evaluates only one

21   alternative to the Proposed Rule. "Alternative C" includes all of the regulatory changes identified

22   in the Proposed Rule, but "would add an additional role for the Services that might increase

23   confidence in the action agencies' determinations where they choose to rely on the applicability

24   provisions of section 402.03(b) without entering informal or formal consultation." Draft EA at

25   10. The Draft EA also describes three alternatives that were considered but not analyzed. Id. at

26   10-11.

27       53.   On October 27, 2008, the Services published a notice in the Federal Register

28   providing a mere 10 calendar days for public comment on the Draft EA.   73 Fed. Reg. 63667

16

1   (Oct. 27, 2008). By letter dated November 6, 2008, the California Attorney General, on behalf of

2   plaintiff People, timely submitted a detailed 13-page comment letter on the Draft EA, stating that

3   "the analysis and conclusions in the Services' EA on the proposed regulations are not objective,

4   reasonable or convincing and do not appear to be made in good faith. Instead, the EA is the

5   epitome of 'form over substance' and is plainly a 'subterfuge designed to rationalize a decision

6   already made'." Accordingly, the letter concludes, the EA fails to take the requisite "hard look"

7   at the Proposed Rule's potentially significant environmental effects, fails to analyze the

8   cumulative effects of and a reasonable range of alternatives to the Proposed Rule, and otherwise

9   fails to meet NEPA's requirements. The Attorney General's comment letter further states that the

10   Proposed Rule will have numerous significant environmental effects that require preparation of

11   an EIS.

12

**B.    The Final Rule, Final EA and FONSI**

13

14      54.   On December 16, 2008, the Services published a Final Rule amending the ESA's

15   section 7 regulations. 73 Fed. Reg. 76272 (Dec. 16, 2008). The Final Rule states that the

16   Services received approximately 235,000 comments on the Proposed Rule, 215,000 of which the

17   Services claimed were "form" letters.  The Services did not respond separately to the remaining

18   20,000 comment letters, but instead prepared generic responses to similar points purportedly

19   raised in the letters. The Final Rule also indicates that the Services had issued a Final EA and

20   FONSI in reliance on the Draft EA. *Id.* at 76286.

21      55.  The Final Rule makes few significant or substantive changes from the Proposed Rule.

22   The Final Rule slightly revises the section 7 exemption criteria in proposed new 50 C.F.R. §

23   402.03(b). Instead of exempting actions and effects that are "an insignificant contributor to any

24   effects on listed species or critical habitat" or "are such that the potential risk of jeopardy to the

25   listed species or adverse modification or destruction of the critical habitat is remote" (Proposed

26   50 C.F.R. § 402.03(b)(2) and (b)(3)(iii)), the Final Rule exempts the effects of actions that "are

27   manifested through global processes and (i) cannot be reliably predicted or measured at the scale

28   of a listed species' current range, or (ii) would result at most in an extremely small, insignificant

17

1   impact on listed species or critical habitat, or (iii) are such that the potential risk of harm to a

2   listed species or critical habitat is remote." Id. at § 402.03(b)(2); former (b)(3)(iii) deleted.

3        56.    The Final Rule also replaces the word "identified" with "measured" and moves the

4   word "meaningful" in the exemption criterion in new section 402.03(b)(3)(i). This section now

5   provides that the effects of the action on a listed species or critical habitat need not be examined if

6   they "[a]re not capable of being measured or detected in a manner that permits meaningful

7   evaluation."

8        57.    The Final Rule adds a sentence to new 50 C.F.R. § 402.13(b) regarding time limits·

9   for informal consultation, which reads as follows: "[i]f the Federal agency terminates consultation

10   at the end of the 60-day period, or if the Service's extension period expires without a written

11   statement whether it concurs with a Federal agency's determination provided for in paragraph (a)

12   of this section, the consultation provision in section 7(a)(2) is satisfied." The Final Rule also adds

13   new subdivision (c) to section 402.13, which allows the Service and Federal agency to agree to

14   extend the informal consultation period for a specified time.[4]

15       58.    Finally, the Final Rule adds a sentence defining "direct effects" as "the immediate

16   effects of the action [which] are not dependent on the occurrence of any intervening actions for

17   the impacts to species or critical habitat to occur." 50 C.F.R. § 402.02. The Final Rule also

18   clarifies that the "essential cause" requirement only applies to indirect, but not direct, effects.

19       59.    Many, if not most, of the federal agency actions and effects that the Final Rule now

20   excludes from consideration under section 7 previously would have required either: (1) informal

21   consultation and written concurrence from the Service as to whether the action is "not likely to

22   adversely affect" listed species and critical habitat, or (2) formal consultation and a biological

23   opinion from the Service.

## CLAIMS FOR RELIEF

25       60.    For each of the following claims below, plaintiff People incorporates by reference

26   each and every allegation set forth in this complaint as if set forth in full below.

---

27       [4] The Final Rule also makes a non-substantive change to section 402.14(b)(1) to track
with the language of section 402.13(b).

**First Claim For Relief**
**(Violations Of The ESA And APA)**

61.    Under governing United States Supreme Court precedent, federal agencies only have authority to adopt regulations that are based on a permissible and reasonable construction of the governing statute -- in this case, the ESA.  Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984); see also 5 U.S.C. § 706(2)(B).  Regulations that are "manifestly contrary to the statute" are beyond the agency's authority to adopt and will be found "in excess of statutory authority jurisdiction, authority, or limitations, or short of statutory right" and arbitrary, capricious and contrary to law, in violation of the APA.  Chevron, 467 U.S. at 844; 5 U.S.C. § 706(2)(A), (B).

62.    In promulgating the Final Rule, defendants exceeded the scope of their authority under the ESA and adopted regulations that are manifestly contrary to the statute.  The Final Rule is contrary to the substantive and procedural requirements of section 7 of the ESA as well as the goals and policies of the ESA.

63.    Specifically, the Final Rule violates: (1) the requirement under section 7(a)(2) that each federal agency, including the Services, "shall insure" that "any action" that is authorized, funded or otherwise carried out by that agency is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat (16 U.S.C. § 1536(a)(2)); (2) the requirement that all section 7 determinations be based on the best available science (id. and § 1536(c)(1)); (3) the requirement that each federal agency, as to any proposed federal agency action, must request information from the relevant Service as to whether listed species  and critical habitat may be present in the area of the proposed action (16 U.S.C. §§ 1536(c)(1)) and if the Service advises that listed species or critical habitat may be present, then further consultation with the Service regarding the proposed action is mandatory under the statute (16 U.S.C. §§ 1536(c)(1), (b)(3)(A)); (4) federal agencies' duty under section 7(a)(1) to utilize their authorities in furtherance of the purposes of the ESA by carrying out programs to conserve listed species (16 U.S.C. § 1536(a)(1)); (5) the purposes of the ESA to provide a means and a program for the conservation of listed species and their habitat (16 U.S.C. § 1531(b)); and (6) the policy of the

19

1   ESA that all federal agencies shall seek to conserve listed species and shall utilize their authorities

2   in furtherance of the purposes of the ESA (16 U.S.C. § 1531(c)).

3       64.    The Final Rule violates the foregoing substantive and procedural requirements of the

4   ESA in numerous respects, including but not limited to, the following provisions: (1) exempting

5   certain types of federal agency actions and effects from section 7 altogether, even if listed species

6   and critical habitat may be present in the action area and may be adversely affected by the action;

7   (2) allowing federal agency project proponents, without the Services' written concurrence and

8   oversight and without any requirement for site-specific analysis or documentation, to determine

9   for themselves whether an action will have no effect or is not likely to adversely affect listed

10  species or critical habitat; (3) allowing federal action agencies to arbitrarily and prematurely

11  terminate informal consultation regardless of whether any consultation has in fact occurred, and

12  regardless of whether the action may adversely affect listed species and critical habitat; (4)

13  unlawfully limiting the type and extent of effects that must be considered in the consultation

14  process, including the wholesale elimination of the effects of increased greenhouse gas emissions,

15  by arbitrarily narrowing the definitions of "indirect" and "cumulative" effects; (5) unreasonably

16  imposing a standard of causation for indirect effects and a requirement that effects be "reasonably

17  certain to occur" based on "clear and substantial information"; and (6) allowing federal action

18  agencies and the Services unlawfully to piecemeal or segment review of federal agency actions

19  under section 7 by: (a) requiring consultation only on those effects of the action that do not meet

20  the consultation exemption criteria of proposed section 403.03(b), (b) allowing a federal action

21  agency to terminate consultation as to "a number of similar actions, an agency program, or a

22  segment of a comprehensive plan" if the agency determines, with the Service's concurrence, that

23  the activity is not likely to adversely affect any listed species or critical habitat; and (c) requiring

24  consultation as to those effects of the action which meet the new, restrictive definitions of

25  "effects" and "cumulative effects."

26      65.    These provisions of the Final Rule will authorize, without adequate analysis or

27  mitigation, myriad federal agency actions and project effects that may or will have significant and

28  adverse direct, indirect and cumulative impacts on listed species and critical habitat, and which

1   may or will result in jeopardy to listed species and/or destruction or adverse modification of

2   critical habitat, contrary to section 7 and the goals, purposes and policies of the ESA.   The Final

3   Rule also removes critical scientific review and oversight, site-specific analysis and

4   documentation from the section 7 consultation process, thereby shielding from agency and public

5   review potentially profound impacts on listed species and critical habitat and precluding federal

6   action agencies and the Services from relying on the best available science, as required by the

7   ESA.

8         66.    For the foregoing reasons, the Final Rule exceeds the Services' statutory jurisdiction,

9   authority, or limitations and is short of the Services' statutory right under the ESA, and is also

10  arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation

11  of the ESA and 5 U.S.C. § 706(2)(A) and (B).

12                      **Second Claim For Relief**
                **(Violations Of NEPA and APA: Failure to Prepare an**
13       **Adequate EA and to Provide for Meaningful Public Review Of Draft EA)**

14        67.    An EA must "provide sufficient evidence and analysis for determining whether to

15  prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. §

16  1508.9(a)(1).

17        68.    The Services' EA purports to "examine whether the proposed regulatory changes will

18  have any direct, indirect, or cumulative impacts on the quality of the human environment."

19  However, the document lacks any analysis whatsoever of the impacts associated with the

20  regulatory changes and does not provide sufficient evidence and analysis for determining whether

21  to prepare an EIS or FONSI.   Instead, the EA concludes, without supporting evidence or

22  analysis, that the Final Rule will have no environmental effects.   Such conclusions, without any

23  evidentiary support, do not satisfy NEPA. *Oregon Natural Res. Council v. United States Bureau*

24  *of Land Mgmt.*, 470 F.3d 818, 823 (9th Cir. 2006); *Blue Mountains Biodiversity Project*, 161 F.3d

25  at 1214.

26        69.    The EA also is inadequate because it is not based on a consideration of the relevant

27  factors, fails to take a "hard look" at the environmental effects of the regulatory changes, ignores

28  numerous potentially significant environmental effects of the regulations, and fails to supply a

21

1  convincing statement of reasons why the potential environmental effects of the regulations are

2  insignificant.   The analysis and conclusions in the EA are not objective, reasonable or

3  convincing, are not made in good faith and are designed to rationalize a pre-determined outcome,

4  contrary to NEPA. *Blue Mountains Biodiversity Project*, 161 F.3d at 1211-12; *Metcalf*, 214 F.3d

5  at 1141-42.

6        70.   Additionally, the EA is inadequate because it does not analyze cumulative effects and

7  fails to evaluate a reasonable range of alternatives. *Native Ecosystems Council*, 304 F.3d at 895-

8  896; *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1217 (9th Cir. 2008); 40 C.F.R. §

9  1508.9(b).

10       71.   Finally, the Services violated NEPA and the APA by providing a wholly inadequate

11  time period – a mere ten calendar days and eight business days -- for the public to comment on

12  the Draft EA. 40 C.F.R. § 1501.4(b).  The Services also failed respond in a meaningful manner to

13  many of the comments submitted on the Draft EA, providing only unsupported and conclusory

14  responses which misstated many of the comments received.

15       72.   For these reasons, the Services acted arbitrarily, capriciously and contrary to law,

16  abused their discretion, and failed to follow the procedures required by law in adopting the Final

17  EA, in violation of NEPA and 5 U.S.C. § 706(2)(A) and (D).

18                        **Third Claim For Relief**
                          **(Violations of NEPA and APA:**
19       **Unlawful Reliance on a FONSI and Failure to Prepare an EIS)**

20       73.   NEPA requires a federal agency to prepare "a detailed statement on . . . the

21  environmental impact" of "major Federal actions significantly affecting the quality of the human

22  environment." 42 U.S.C. § 4332(2)(C)(i).  In the Ninth Circuit, if "substantial questions are

23  raised" as to whether a proposed federal agency action "may have a significant effect" on the

24  environment, then the agency must prepare an EIS on the proposed action. *Klamath Siskiyou*

25  *Wildlands Ctr.*, 468 F.3d at 562.

26       74.   In this case, as the Attorney General's and other comment letters on the EA

27  demonstrate, there clearly are "substantial questions," if not certainties, that the Final Rule will or

28  may have a significant effect on the quality of the human environment.  The Final Rule meets

1  several of the criteria in the NEPA regulations for evaluating the significance of a potential

2  environmental effect. 40 C.F.R. § 1508.27(b). Specifically: (1) the regulations are highly

3  controversial because they are the most significant substantive changes to the federal ESA's

4  implementing regulations in over 20 years, and over 235,000 public comments were received on

5  the regulations; (2) in limiting the number and extent of section 7 consultations under the federal

6  ESA, particularly with respect to federal actions with significant greenhouse gas emissions, the

7  regulations involve unique or unknown risks to listed species and their habitat; (3) the regulations

8  will establish a negative precedent for evaluating and mitigating the adverse effects of federal

9  agency actions under the federal ESA; (4) the regulations will have significant cumulative effects;

10  and (5) the regulations will adversely affect listed species and critical habitat.

11      75.    The defendants' adoption of the Final Rule in reliance on an unsupported FONSI and

12  failure to prepare an EIS on the Proposed Rule constitutes agency action unlawfully or

13  unreasonably withheld or delayed, and/or is arbitrary, capricious, an abuse of discretion, contrary

14  to law, and not in accordance with proper procedures, in violation of NEPA and 5 U.S.C. §

15  706(1) and 706(2)(A) and (D).

**Fourth Claim For Relief**
**(Violation of the APA: Failure to Provide a Reasoned**
**Analysis of and Justification for Final Rule)**

18      76.    Pursuant to 5 U.S.C. § 706(2) of the APA and controlling case law, a federal agency

19  must supply a reasoned analysis and justification for proposed regulatory changes that is based on

20  the evidence before the agency. An agency's failure to do so renders its action arbitrary and

21  capricious and an abuse of discretion and therefore invalid.

22      77.    The Services' stated justifications for, analysis of, and responses to public criticisms

23  of and comments on the regulatory changes in the Final Rule are not reasonable and are not

24  supported by and are contrary to the evidence in the record. Examples of the Services' failure to

25  adequately justify and support their reasons for adopting the Final Rule include, but are not

26  limited to, the following.

27      78.    The Services claim that the Final Rule is required "to reduce the number of

28  unnecessary consultations," and yet the Services did not describe what types of consultations, or

Complaint for Declaratory and Injunctive Relief  (Case No.          )

how many, the Services deem "unnecessary" and the reasons therefor. 73 Fed. Reg. 47871. Nor did the Services explain how reducing the number of "unnecessary" consultations is consistent with their own and federal action agencies' statutory mandates under the ESA.

79.    The Services also rely on their increased workload as a justification for the Final Rule, but fail to explain why adopting wholesale exemptions, narrowing the definitions of indirect and cumulative effects, and allowing for arbitrary and premature termination of informal consultation is the only reasonable or feasible means of addressing this problem. This failure is particularly egregious in light of the Services' clear duties to conserve listed species and their habitat under the ESA.

80.    The Services also assert that Federal action agencies have gained "considerable experience" in implementing the ESA, which would justify allowing these agencies to make their own determinations as to whether their actions are likely to adversely affect listed species. 73 Fed. Reg. 47868. However, the Services do not provide any evidentiary support or justification for that assertion, nor do they explain why or document how all federal agencies have the necessary biological expertise, objectivity, and human and financial resources to make accurate determinations of adverse effect. Moreover, the Final Rule, in stating that most, but not all, federal agencies have the requisite expertise, itself belies the Services' claim.

81.    Even assuming federal agencies have personnel who are qualified to make determinations of adverse effect, the Services do not explain how federal agencies' compliance with the new rules will be ensured absent any Service oversight or any requirement for federal agencies to conduct site-specific analysis and document their determinations.

82.    The Services further state that the regulations are necessary to "reinforce" the Services' view "that there is no requirement to consult on greenhouse gas (GHG) emissions' contribution to global warming and its associated impacts on listed species." 73 Fed. Reg. 47872. Yet, the Services do not explain why their view is supported by the ESA, or why a species can be listed under the ESA due to the impacts of global warming on such species and its habitat, but federal agencies have no obligation to address their projects' contribution to these impacts due to increased greenhouse gas emissions.

24

83.    The Final Rule also does not define or explain key phrases and concepts, such as "global processes," "remote" risk, or "meaningful evaluation," nor does it provide criteria or guidelines for interpretation and application of these phrases and concepts.

84.    In sum, the Final Rule is not supported by any rationale that is consistent with the purposes of the ESA, will undermine safeguards for endangered and threatened species, and the purpose and need for the Final Rule is not coherently or rationally explained in or supported by the evidence in the rulemaking record and is contradicted by the evidence in the record.

85.    Accordingly, the Services acted arbitrarily and capriciously and contrary to law and abused their discretion in adopting the Final Rule, in violation of 5 U.S.C. § 706(2)(A).

### Fifth Claim For Relief
### (Violation of the APA: Failure to Provide Adequate Opportunity
### for Public Comment and Meaningful Response to Public Comments)

86.    The APA requires federal agencies to publish notice of a proposed rule making and "give interested persons an opportunity to participate in the rule making through submission of written data, views or arguments." 5 U.S.C. § 553(b), (c).  The agency is required to review and respond to the public comments submitted.  5 U.S.C. § 553(c).

87.    The Services failed to satisfy this requirement in two respects.  First, the Final Rule includes a new substantive provision that was not included in the Proposed Rule and on which the public was not afforded any opportunity to comment.  The Final Rule includes a new exemption from section 7 for the effects of agency actions that federal action agencies determine are "manifested through global processes" and that meet other specified criteria.

88.    Second, despite the fact that the Services received approximately 235,000 comments on the Proposed Rule, many of which were extremely detailed and substantive, the Services adopted the Final Rule only two months after the close of public comment on the Proposed Rule. Given this extremely rushed timeframe for responding to public comments, the Services responded only categorically and did not respond individually to any of the public comments received, failed to respond at all to many comments concerning the legality and effects of the Proposed Rule, and responded only in a conclusory and truncated manner to other comments

25

1   received, with explanations and reasons that are unsupported by both the ESA and the evidence in

2   the record.

3       89.   In so doing, defendants have failed to follow the proper procedures for adopting the

4   Final Rule and have acted arbitrarily, capriciously, contrary to the manner required by law and

5   not in accordance with the procedure required by law and have abused their discretion, in

6   violation of 5 U.S.C. § 553 and 706(2)(A) and (D).

7                              **PRAYER FOR RELIEF**

8       WHEREFORE, plaintiff People respectfully requests that this Court:

9       A.   Issue a declaratory judgment that defendants acted in excess of their statutory

10  authority, jurisdiction, and limitations and short of their statutory right under the ESA in adopting

11  the Final Rule, in violation of the ESA and 5 U.S.C. § 706(2)(B);

12      B.   Issue a declaratory judgment that defendants acted arbitrarily, capriciously and

13  contrary to law, abused their discretion, and failed to follow the procedure required by law under

14  the ESA and APA in adopting the Final Rule, in violation of the ESA and 5 U.S.C. § 706(2)(A)

15  and (D);

16      C.   Issue a declaratory judgment that defendants acted arbitrarily, capriciously and

17  contrary to law, abused their discretion, and failed to follow the procedure required by law under

18  NEPA and the APA in adopting the Final EA for the Final Rule, violation of NEPA and 5 U.S.C.

19  § 706(2)(A) and (D);

20      D.   Issue a declaratory judgment that defendants unlawfully and unreasonably failed to

21  prepare an EIS on the Proposed Rule under NEPA, or alternatively acted arbitrarily, capriciously

22  and contrary to law, abused their discretion, and failed to follow the procedure required by law

23  under NEPA and the APA in failing to prepare an EIS on the Proposed Rule, in violation of

24  NEPA and 5 U.S.C. §§ 706(1), 706(2)(A) and (D);

25      E.   Issue a mandatory injunction remanding the Final Rule to defendants and

26  commanding them to immediately vacate and withdraw the Final Rule;

27  //

28

1      F.      Award plaintiff People its costs, expenses and reasonable attorneys' fees; and

2      G.      Award such other relief as this Court may deem just and proper.

3

Dated:  December 29, 2008                        Respectfully Submitted,

4

5                                                EDMUND G. BROWN JR.
                                                 Attorney General of California
                                                 J. MATTHEW RODRIQUEZ
6                                                Chief Assistant Attorney General
                                                 KEN ALEX
7                                                Senior Assistant Attorney General
                                                 MEGAN ACEVEDO
8                                                Deputy Attorney General

9

10                                               TARA L. MUELLER
                                                 Deputy Attorney General
11                                               *Attorneys for Plaintiff People of the State of*
                                                 *California ex rel. Edmund G. Brown Jr.,*
12                                               *Attorney General*

13   OK2008900593
     90101895.doc
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        27